E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR JOHNSON COUNTY

| | |
|---|---|
| KEVIN CHRISTIANS, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>KEMPHARM, INC., TRAVIS C. MICKLE, PH.D. GORDON K. JOHNSON, R. LADUANE CLIFTON SVEN GUENTHER, PH.D., CHRISTAL M.M. MICKLE, DANNY L. THOMPSON, MATTHEW R. PLOOSTER, RICHARD W. PASCOE, JOSEPH B. SALURI, DAVID S. TIERNEY, COWEN AND COMPANY, LLC, RBC CAPITAL MARKETS, LLC, CANACCORD GENUITY INC. and OPPENHEIMER & CO. INC.,<br><br>                    Defendants. | CASE NO.:<br><br><br><br><br><br><br>Class Action Petition at Law and Jury Demand |

Plaintiff Kevin Christians ( "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following, based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of Securities and Exchange Commission ("SEC") filings made by KemPharm, Inc. ("KemPharm" or the "Company"), analyst and media reports, and other commentary analyses concerning KemPharm.  Plaintiff's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this action under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against: (1) KemPharm; (2) certain of KemPharm's senior executives

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

and directors who signed the Registration Statement (as defined below) in connection with the Company's April 16, 2015 Initial Public Offering ("IPO" or the "Offering"); and (3) each of the investment banks that acted as underwriters for the Offering. In the Offering, the Company and the underwriters sold 5,090,909 shares of KemPharm common stock at a price of $11 per share. KemPharm's preferred common stock is listed and traded on the NASDAQ Global Market ("NASDAQ") under the ticker symbol, "KMPH."

2.    Defendant KemPharm is a specialty pharmaceutical company developing so-called, "prodrugs," believed to be improved versions of widely prescribed drugs, using a technology platform focused on new molecular entities ("NMEs").  The Company uses a "Ligand Activated Therapy" ("LAT") discovery platform to create product candidates that offer improvements over FDA-approved and widely prescribed drugs.  Fundamentally, KemPharm's business model is to take already-existing FDA indicated drugs and improve them through a "Ligand Activated Therapy" prodrug program to improve their drug properties, such as by making them harder to abuse or creating drugs with better bioavailability.

3.    KemPharm's most advanced drug candidate, KP201/APAP, or Apadaz, is an NME prodrug composed of benzhydrocodone hydrochloride ("HCl"), a prodrug of hydrocodone and benzoic acid, and acetaminophen (APAP), being developed as an immediate-release drug to treat acute moderate to moderately severe pain.

4.    In December 2015, KemPharm submitted a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") for Apadaz and requested priority review.  If priority review is granted, the FDA typically takes action within six months from the date the NDA is accepted for review, potentially allowing for approval as early as Q3 2016.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

5.      Apadaz was intended to be labeled as an "abuse-deterrent" opioid product that offers equivalent efficacy to the existing standard-of-care, IR hydrocodone/APAP combination products such as Vicodin, Norco and Lortab, but with reduced addictive effect.  KemPharm "re-engineered" hydrocodone into benzhydrocodone, intending to "impart abuse-deterrent properties at the molecular level."  By combining hydrocodone with benzoic acid, a widely used food preservative, the "benzhydrocodone" would not be pharmacologically active until metabolized by the body's intestinal tract.  The Company sought FDA approval to label the drug as an "abuse-deterrent formulation" ("ADF") on the basis that crushing or grinding benzhydrocodone would not have any impact on its release profile, preventing abuse.

6.      On April 1, 2015, the FDA issued a final guidance to assist industry in developing opioid drug products with potentially abuse-deterrent properties entitled, "Guidance for Industry: Abuse-Deterrent Opioids – Evaluation and Labeling." The guidance explains the FDA's current thinking about the studies that should be conducted to demonstrate that a given formulation has abuse-deterrent properties. The guidance also *makes recommendations about how those studies should be performed and evaluated, and discusses what labeling claims may be approved, based on the results of those studies*.[1]

7.      On or around April 16, 2015, KemPharm conducted the Offering, selling 5,090,909 common shares, at a price to the public of $11.00 per share.  The net proceeds, before expenses, to KemPharm from the Offering, were approximately $52,079,999.

8.      In violation of the Securities Act, Defendants negligently issued untrue statements of material facts and omitted to state material facts required to be stated from the Registration Statement and incorporated Offering Materials that the Company filed with the SEC in support

---

[1]      Unless otherwise noted, all emphasis added.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

of the Offering.  Defendants are strictly liable for any and all material untrue statements or omissions in the Offering Materials.  Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about adverse conditions, risks, and uncertainties.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii).  Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew, or should have reasonably expected, would have a materially adverse impact on KemPharm's business.  Defendants failed to fulfill this obligation as well.

9.    Unbeknownst to investors, the Registration Statement's representations were materially untrue, inaccurate, misleading, and/or incomplete, because, upon information and belief, at the time of the Offering, the Company failed to disclose that the Company constructed a deficient study regarding Apadaz's abuse-deterrent properties, and, as such, Apadaz would not be labeled as an "abuse-deterrent" product by the FDA. When Apadaz failed to be labeled as an "abuse-deterrent," Apadaz lost its competitive advantage, becoming just another painkiller on the market.

10.    Unfortunately for investors, the truth concerning the nature and extent of the problems facing the Company did not begin to emerge until the Offering was complete when, on May 5, 2016, the Company announced that the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the FDA had reviewed and voted on Apadaz, determining by a vote of 16 to 4 that Apadaz should be approved for its proposed indication of the management of acute pain that requires an opioid, ***but voted 18 to 2 against inclusion of abuse deterrent labeling for the product***.  The drug, thus, was

approved to manage acute pain, but would not be able to be sold with the Company's main planned competitive advantage of labeling the drug as an "abuse-deterring" product.

11.    Notably, James Tolliver ("Tolliver"), pharmacologist for the controlled substance staff within the Office of the Center Director, Center for Drug Evaluation and Research at the FDA stated:

> I want to briefly discuss study KP201.A03. However, ***I want to note at the outset that this study has some issue with study design that make it difficult to use in assessing the abuse-deterrent effect of [Apadaz]. . .***

12.    On this news, the Company's stock price fell on trading conducted on Thursday, May 5, 2016, from a May 5, 2016 price of $15.67 per share to a May 6, 2016 price of $6.91 per share, a one-day decline of 56%.

13.    The stock has plummeted by over 76% since its Offering.  As of November 4, 2016, the last trading day before this complaint was filed, the Company's shares closed at $3.70 per share.  For all of the claims stated herein, Plaintiff expressly excludes any allegation that could be construed as alleging fraud or intentional or reckless misconduct.  Plaintiff's claims are based solely on claims of strict liability under the Securities Act.  By this action, Plaintiff, on behalf of himself and the other Class members who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a recovery for the damages he has suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

## JURISDICTION AND VENUE

14.    This Court has subject jurisdiction pursuant to Iowa Code Ann. § 602.6101 and Section 22 of the federal Securities Act, 15 U.S.C. §77v.  Defendant's principal place of business is located in the state of Iowa, and many of the Defendants have offices in Iowa.

15.    This action is not removable.   The claims alleged herein arise under §§11, 12(a)(2), and 15 of the Securities Act.  *See* 15 U.S.C. §§77k, 77l(a)(2), and 77o.  Section 22 of the Securities Act, 15 U.S.C. §77v, expressly states that "[e]xcept as provided in [section 16(c)], no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  Section 16(c) refers to "covered class actions brought in any State court involving a covered security, as set forth in subsection (b)"; and subsection (b) of Section 16, in turn, includes within its scope only covered class actions "based upon the statutory or common law of any State or subdivision thereof."  *See* 15 U.S.C. §77p.  This is an action asserting only federal law claims.  Thus, this action is not removable to federal court.

16.    This Court has personal jurisdiction over each of the Defendants, because they are either citizens of the state of Iowa, and/or the claims and allegations asserted herein arise from conduct and actions taken by the Defendants which occurred within the state of Iowa, including the operations of KemPharm and various Board meetings, such that due process of law will not be offended by this Court's exercise of personal jurisdiction over each of the Defendants.

17.    Venue is proper pursuant to Iowa Code Ann. § 616, because many of the Defendants have places of business in Johnson County, KemPharm has its principal place of business located within Johnson County, and numerous actions relating to the claims at issue in this action occurred within this Court's venue, including the preparation and dissemination of the materially inaccurate, misleading, and incomplete Registration Statement and Prospectus (which

E-FILED 2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

were prepared by Defendants, or with their participation, acquiescence, encouragement, cooperation, and/or assistance), which occurred in whole or in substantial part in this county.

## PARTIES

### A.    Plaintiff

18.    Plaintiff Kevin Christians purchased shares of the Company's common stock pursuant and/or traceable to the untrue and misleading Registration Statement and was damaged thereby.

### B.    Defendants

19.    Defendant KemPharm is clinical-stage specialty pharmaceutical company which discovers and develops new proprietary prodrugs in the United States. KemPharm's advanced product candidate is Apadaz, or KP201/APAP, which consists of KP201 prodrug of hydrocodone formulated in combination with acetaminophen.  KemPharm was founded in 2006 and is headquartered in Coralville, Iowa. KemPharm's common stock is listed and traded on the NASDAQ under the ticker symbol, "KMPH."

20.    Defendant Travis C. Mickle ("T. Mickle") was, at all relevant times, the Company's Chief Executive Officer ("CEO"), President and Director.  Defendant T. Mickle signed or authorized the signing of the Registration Statement.

21.    Defendant Gordon K. Johnson ("Johnson") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO").  Defendant Johnson signed or authorized the signing of the Registration Statement.

22.    Defendant R. LaDuane Clifton ("Clifton") was, at all relevant times, Vice President of Finance and Corporate Controller of the Company.  Defendant Clifton signed or authorized the signing of the Registration Statement.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

23.    Defendant Sven Guenther, Ph. D. ("Guenther") was, at all relevant times, Executive Vice President Research and Development and a director of the Company.  Defendant Guenther signed or authorized the signing of the Registration Statement.

24.    Defendant Christal M.M. Mickle ("C. Mickle") was, at all relevant times, Vice President Operations and Product Development and a director of the Company.  Defendant C. Mickle signed or authorized the signing of the Registration Statement.

25.    Defendant Danny L. Thompson ("Thompson") was, at all relevant times, a director of the Company.  Defendant Thompson signed or authorized the signing of the Registration Statement.

26.    Defendant Matthew R. Plooster ("Plooster") was, at all relevant times, a director of the Company.  Defendant Plooster signed or authorized the signing of the Registration Statement.

27.    Defendant Richard W. Pascoe ("Pascoe") was, at all relevant times, a director of the Company.  Defendant Pascoe signed or authorized the signing of the Registration Statement.

28.    Defendant Joseph B. Saluri ("Saluri") was, at all relevant times, a director of the Company.  Defendant Saluri signed or authorized the signing of the Registration Statement.

29.    Defendant David S. Tierney ("Tierney") was, at all relevant times, a director of the Company.  Defendant Tierney signed or authorized the signing of the Registration Statement.

30.    Defendants T. Mickle, Johnson, Clifton, Guenther, C. Mickle, Thompson, Plooster, Pascoe, Saluri and Tierney are collectively referred to herein as the "Individual Defendants."

31.    The Individual Defendants each participated in the preparation of and signed (or authorized the signing of) Registration Statement.  Defendant KemPharm and the Individual

8

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

Defendants who signed (or authorized the signing of) the Registration Statement are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of KemPharm's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

32.    Defendant Cowen and Company, LLC ("Cowen") was an underwriter for the Offering.  In the Offering, Cowen agreed to purchase 2,163,637 KemPharm shares.  Cowen acted as a joint book-running manager of the Offering.

33.    Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the Offering.  In the Offering, RBC agreed to purchase 1,654,546 KemPharm shares.  RBC acted as a joint book-running manager of the Offering.

34.    Defendant Canaccord Genuity Inc ("Canaccord") was an underwriter for the Offering.  In the Offering, Canaccord agreed to purchase 636,363 KemPharm shares.  Canaccord acted as co-manager of the Offering.

35.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter for the Offering.  In the Offering, Oppenheimer agreed to purchase 636,363 KemPharm shares.  Oppenheimer acted as co-manager of the Offering.

36.    Defendants Cowen, RBC, Canaccord, and Oppenhimer are referred to collectively as the "Underwriter Defendants."  The Underwriter Defendants each served as a financial advisor for and assisted in the preparation and dissemination of the Company's materially untrue and misleading Registration Statement and Prospectus.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

37.     The Underwriter Defendants are primarily investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities.  As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

38.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but materially incorrect and/or materially misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

39.     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the Offering.  Representatives of the Underwriter Defendants also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

40.     In addition to having unlimited access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with their review of

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants were negligent in not knowing of the Company's undisclosed existing problems and plans and the materially untrue statements and omissions contained in the Registration Statement as detailed herein.

41.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the offer and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiff and the Class.

42.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the untrue and misleading statements in the Offering's Registration Statement and Prospectus.  The Underwriter Defendants' negligent due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

### I.    APADAZ NDA & FDA'S GUIDANCE FOR ABUSE-DETERRENT OPIOIDS

1.    In December 2015, KemPharm submitted an NDA to the FDA for Apadaz and requested priority review.  If priority review is granted, the FDA typically takes action within six months from the date the NDA is accepted for review.

2.    On April 1, 2015, the FDA issued a final guidance to assist industry in developing opioid drug products with potentially abuse-deterrent properties entitled, "Guidance for Industry: Abuse-Deterrent Opioids – Evaluation and Labeling." The guidance explained the FDA's current thinking about the studies that should be conducted to demonstrate that a given formulation has abuse-deterrent properties. ***The guidance also made recommendations about how those studies***

*should be performed and evaluated, and discussed what labeling claims may be approved, based on the results of those studies.*

## II.    KEMPHARM, INC. & ITS LEAD PRODUCT CANDIDATE, APADAZ

3.    KemPharm is a clinical-stage specialty pharmaceutical company engaged in the discovery and development of proprietary prodrugs that KMPH believes will be improved versions of widely prescribed, approved drugs. KemPharm employs its Ligand Activated Therapy ("LAT") platform technology to create its prodrugs, each of which is a new molecular entity ("NME"), and, therefore, may be eligible for composition-of-matter patent protection.

4.    Apadaz, or KP201/APAP, KemPharm's most advanced product candidate, consists of KP201, its NME prodrug of hydrocodone, formulated in combination with acetaminophen, or APAP.

5.    KemPharm developed Apadaz as an immediate release ("IR") product candidate for the treatment of acute moderate to moderately severe pain.  The Company designed Apadaz with abuse-deterrent properties to address the epidemic of opioid abuse in the United States, and with the intention of being the first FDA-approved IR product for the treatment of pain with the efficacy of hydrocodone/APAP combination products and abuse-deterrent labeling.

## III.    THE OFFERING AND THE COMPANY'S MATERIALLY UNTRUE AND INCOMPLETE REGISTRATION STATEMENT AND PROSPECTUS

6.    On or around April 16, 2015, KemPharm conducted the Offering, selling 5,090,909 shares of its common stock at a price of $11.00 per share.  All of the common stock was offered, and KemPharm granted the underwriters a 30-day option to purchase up to 763,636 additional shares of common stock from KemPharm. Cowen and RBC acted as joint book-running managers; Canaccord and Oppenheimer acted as co-managers for the Offering.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

7.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state the facts necessary to make the statements not misleading, and was not prepared in accordance with the rules and regulations governing the Registration Statement's preparation.  Given the Individual Defendants' interest in ensuring a favorably high offering price, it is hardly surprising that the Company's Registration Statement, and the Prospectus incorporated therein, presented a highly positive picture of the Company's business, performance, prospects, and products, while omitting crucial realities.

8.    The Registration Statement stated the following, in pertinent part, regarding Apadaz approval as an abuse-deterrent painkiller, particularly, given the prevailing political and historical landscape of FDA regulation:

> We designed KP201/APAP with abuse-deterrent properties to address the epidemic of opioid abuse in the United States. Prescription drug overdose death rates in the United States have increased five-fold since 1980, and by 2009, drug overdose deaths outnumbered deaths due to motor vehicle crashes. The increasing negative social consequences and costs of prescription drug abuse led the U.S. Food and Drug Administration, or FDA, to publish draft guidance in January 2013 and final guidance in April 2015 with regard to the evaluation and labeling of abuse-deterrent opioids. The FDA has approved abuse-deterrent labeling language in the product labels for four abuse-deterrent opioids: OxyContin, Targiniq ER, Embeda and Hysingla.

> We believe that KP201/APAP has the potential to be the first FDA-approved IR product for the treatment of pain with the efficacy of hydrocodone/APAP combination products and abuse-deterrent labeling. We have completed a bioavailability trial comparing KP201/APAP to Norco, an approved hydrocodone/APAP combination product, and based on this trial, the FDA confirmed at our October 2013 End-of-Phase 2 meeting that the results of the trial support a finding that KP201/APAP is bioequivalent to Norco. Bioavailability refers to the rate and total amount of a drug that reaches the target in the body after administration, and two drugs are said to be bioequivalent if there is no clinically significant difference in their bioavailability. We are conducting clinical trials that are designed with the goal of obtaining abuse-deterrent claims in our product label for KP201/APAP. We intend to submit a new drug application, or NDA, under 505(b)(2), otherwise known as a 505(b)(2) NDA, for KP201/APAP to the FDA in the second half of 2015. We believe our NDA will receive priority review like other abuse-deterrent opioids.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

9.      In addition, the Company touted its prior success in obtaining FDA approval, including sales numbers for a previous FDA approved product:

> Key members of our senior management, while at New River Pharmaceuticals Inc., were instrumental in the development of Vyvanse, a prodrug of amphetamine indicated for ADHD, through FDA approval. New River was acquired by Shire plc in 2007 and Vyvanse generated over $1.2 billion in sales in 2013.

10.     In connection with the Company's attempt to gain FDA approval for abuse-deterrent claims, the Company also stated that it would conduct human abuse liability clinical trials:

> The commercial success of KP201/APAP and most of our other product candidates will depend upon our ability to obtain FDA-approved labeling describing their abuse-deterrent features. Our failure to achieve FDA approval of product labeling containing such information will prevent our advertising and promotion of the abuse-deterrent features of our product candidates in order to differentiate them from other similar products. This would make our products less competitive in the market.
>
> * * *
>
> In September 2014, we initiated two human abuse liability trials, each intended to generate data that we expect to include in our 505(b)(2) NDA submission. We believe the data from these trials, together with the data from the tamper-resistant extraction studies we are conducting, if the data is positive, will be instrumental in obtaining the FDA's Category 1, 2 and 3 abuse-deterrent language in the KP201/APAP product label, if it is approved.

11.     The above statements were materially untrue and misleading and omitted material information because, upon information and belief, at the time of the Offering, the Company failed to disclose that the Company constructed a deficient study regarding Apadaz's abuse-deterrent properties, and as such, Apadaz would not be labeled as an "abuse-deterrent" product by the FDA. When Apadaz failed to be labeled as an "abuse-deterrent," Apadaz lost its competitive advantage, becoming just another painkiller on the market.

12.     In addition, pursuant to Item 303 of Regulation S-K (17 C.F.R. §229.303), and the SEC's related interpretive releases thereto, including any known trends, issuers are required to

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  Any adverse events and/or uncertainties associated with demand for KemPharm's products were reasonably likely to have a material impact on KemPharm's profitability, and, therefore, were required to be (but were not) disclosed in the Registration Statement under Item 303.

### THE TRUTH BEGINS TO EMERGE

13.     Unfortunately for investors, the truth concerning the nature and extent of the problems facing the Company did not begin to emerge until the Offering was complete, when on May 5, 2016, the Company announced that the Anesthetic and Analgesic Drug Products Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the FDA had reviewed and voted on Apadaz, determining by a vote of 16 to 4 that Apadaz should be approved for its proposed indication of the management of acute pain that requires an opioid, ***but voted 18 to 2 against inclusion of abuse deterrent labeling for the product.***  The drug, thus, was approved to manage acute pain, but would not be able to be sold with the Company's main planned competitive advantage of labeling the drug as an "abuse-deterring" product.

14.     On that day, during the FDA proceedings, Dr. Jeffrey Gudin, director of pain management and palliative care at the Englewood Hospital and Medical Center in New Jersey and clinical instructor of anesthesiology at the Icahn School of Medicine at Mount Sinai, stated that "with the product at hand [Apadaz], there's no additional benefit using the drug any way other than orally. And I think that's one of the things we were asked to look at."

15.     Notably, Tolliver stated the following regarding Apadaz:

For drug like, high, and take drug again, when comparisons are made within each dosage level, the mean scores are numerically very similar and not statistically significantly different between [Apadaz] and Norco.

With the comparable levels of drug liking and high at each dosage level, *it is not surprising that subjects expressed a very similar willingness to take [Apadaz] or Norice again if given the opportunity to do so.*

16.    Tolliver also stated the following regarding KemPharm's improper study design:

I want to briefly discuss study KP201.A03. However, *I want to note at the outset that this study has some issue with study design that make it difficult to use in assessing the abuse-deterrent effect of [Apadaz] to intranasal abuse*.

Study KP201.A03 is a pharmacokinetic study to which was added the pharmacodynamic measure of drug-liking VAS. The study is a randomized, double-blind, single-dose, crossover study having the primary objective of comparing the rate and extent of absorption of hydrocodone and hydromorphone from hydrocodone bitartrate API in KP201, administered to non-dependent recreational opioid users.

The treatments consisted of the active pharmaceutical ingredients, 13.34 milligrams KP201 and 15 milligrams hydrocodone bitartrate. *There were only two treatments. There was no placebo group.*

* * *

*There are some deficiencies with this study, and they're included below*. *The study involved insufflation of KP201 API and hydrocodone bitartrate API and not the products KP201/APAP and Norco*. As such, the study does not take into account possible effects of either mass of powder to be insufflated, that is 13 to 15 milligrams versus 850 to 1,100 milligrams, or the effects of APAP on the insufflation experience as would occur following insufflation of the products*. There was no drug discrimination, also known as qualification phase. There was no placebo treatment for the treatment phase*. And I think an important point is *there were no additional subjective reinforcing measures, such as high and take drug again conducted, which could have been used to support observed effects of the drug-liking VAS*. In conclusion, an oral human abuse potential study KP201.A01 at similar dosage levels of low, medium, and high, oral KP201/APAP and Norco produced similar levels of drug liking, high, and take drug again. So this study failed the primary endpoint of Emax for drug liking.

17.    On this news, the Company's stock fell from a May 5, 2016 price of $15.67 per share, to a May 6, 2016 price of $6.91 per share, a one-day decline of 56%.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action on behalf of a Class consisting of all those who purchased the Company's common stock pursuant or traceable to the Company's

16

E-FILED 2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

Offering and Registration Statement and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company at all relevant times; members of their immediate families, and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

19.     The members of the Class are so numerous or so constutited that joinder of all members, whether or not otherwise required or permitted, is impracticable. Although the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

20.     There is a question of law or fact common to the Class. These common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether the Prospectus and Registration Statement contained materially false and misleading statements and omissions; and

c.      to what extent Plaintiff and members of the Class have sustained damages, and the proper measure of damages.

21.     A class action should be permitted for the fair and efficient adjudication of the controversy.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

22.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.    Joint and common interests exist among the members of the Class.

24.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and vary adjudications which respect to indivdiaul members of the class that would establish incompatible standards of conduct for a party opposing the class.

25.    Adjudications with respect to individual members of the Class, as a practical matter, would be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

26.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief, *i.e.,* rescission, appropriate with respect to the Class as a whole.

27.    Oher means of adjudicating the claims stated herein would be impracticable and inefficient.

28.    The class action contemplated herein offers the most appropriate means of adjudicating the claims stated herein.

29.    Class members who are not representative parties do not have a substantial interest in individually controlling the prosection of separate actions.

30.    Management of the class action as contemplated herein poses no unusual difficulties.

31.    No conflict of laws issues involved pose unusual difficulties.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

32.    The claims of individual Class members are insufficient in the amounts or interests involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the Class.

33.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

34.    The Plaintiff's counsel will adequately represent the interests of the Class.

35.    Plaintiff does not have a conflict of interest in the maintenance of the class action.

36.    Plaintiff has, or can acquire, financial resources to insure that the interest of the Class will not be harmed.

**FIRST CLAIM**
**Violations of §11 of the Securities Act**
**Against All Defendants**

37.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38.    This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

39.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

40.    The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement, and for the failure of the Registration Statement to be complete and accurate.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

41.    The Individual Defendants each signed or authorized the signing of the Registration Statement.  As such, each Individual Defendant is strictly liable for the materially inaccurate statements contained in the Registration Statement, and for the failure of the Registration Statement to be complete and accurate, unless the Individual Defendants are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

42.    The Underwriter Defendants each served as underwriters in connection with the Offering.  As such, the Underwriter Defendants are strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless the Underwriter Defendants are able to carry their burden of establishing an affirmative "due diligence" defense.  The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Underwriter Defendants had a duty to ensure that the statements were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

43.     By reason of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

44.     Plaintiff acquired the Company's common stock pursuant or traceable to the Registration Statement, and without knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages, and the price of the Company's common stock declined substantially, due to material misstatements in the Registration Statement.

45.     This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

46.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violations of §12(a)(2) of the Securities Act**
**Against All Defendants**

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Offering.  Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Offering.   The Registration

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the Company's shares.

49.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  Defendants' acts of solicitation included participating in the preparation of the materially untrue and incomplete Registration Statement.

50.    As set forth more specifically above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

51.    Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

52.    The Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had the Defendants done so, these Defendants could have known of the material misstatements and omissions alleged herein.

53.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's shares were sold to the Class in connection with the Offering.

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

## THIRD CLAIM
### For Violations of §15 of the Securities Act
### Against the Individual Defendants

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants, individually and collectively, had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein.

56.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiff as Class representative;

B.     Awarding Plaintiff and the other members of the Class compensatory damages;

C.     Awarding Plaintiff and the other members of the Class rescission on their §12(a)(2) claims;

E-FILED  2016 NOV 04 4:31 PM JOHNSON - CLERK OF DISTRICT COURT

D.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.      Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

DATED: November 4, 2016

/s/ Mollie Pawlosky
Mollie Pawlosky, AT0006198
John E. Lande, AT0010976
DICKINSON, MACKAMAN, TYLER & HAGEN, P.C.
699 Walnut Street, Suite 1600
Des Moines, IA 50309-3986
Telephone: (515) 244-2600
Facsimile: (515) 246-4550
mpawlosky@dickinsonlaw.com
jlande@dickinsonlaw.com

Geoffrey M. Johnson (PHV pending)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (216) 229-6092
gjohnson@scott-scott.com

*Attorneys for Plaintiff Kevin Christians*